# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **RAMON LOPEZ,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 96-1972 (AK) |
| | ) | |
| **UNITED STATES OF AMERICA** *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION

Presently pending before the Court are the following cross-motions for summary

judgment:

1.   Plaintiff's Motion for Summary Judgment and Statement of Material Facts as to Which

there is No Genuine Issue ("Pl. Mot.") [96], Defendant's Opposition and Memorandum in

Support ("Def. Opp'n") [125], and Plaintiff's Reply ("Pl. Reply") [128];

2.   Defendants' (First) Motion for Summary Judgment ("1st Def. Mot.") [99], Plaintiff's

Opposition ("1st Pl. Opp'n") [101], and Defendants' Reply ("1st Def. Reply") [102]; and

3.   Defendants' (Second) Motion for Summary Judgment[1] ("2nd Def. Mot.") [126],

Plaintiff's Opposition[2] ("2nd Pl. Opp'n") [128], and Defendants' Reply in Further

Support of Defendants' Second Cross Motion for Summary Judgment ("2nd Def. Reply")

---

[1]Defendants' Second Cross-Motion for Summary Judgment was also filed as Defendants' Opposition to Plaintiff's Motion for Summary Judgment.  Docket numbers [125] and [126] are therefore identical.

[2]Plaintiff's Opposition to Defendants' Second Cross-Motion for Summary Judgment was also filed as his Reply to Plaintiff's Original Motion for Summary Judgment.

[131].

## **Factual and Procedural Background**

In the later part of 1992, Plaintiff Ramon Lopez, who had been convicted of multiple counts of drug trafficking, arranged to buy his way out of prison for $50,000. Lopez made a deal with U.S. Marshal Mickey Hernandez, who was working undercover and who agreed to arrange Lopez's escape under the guise of an administrative mistake. (*See* Conboy Report of Investigation dated 8/11/1992 ("8/11/92 Report of Investigation"), *attached as* Ex. 2 (unnumbered page 1) to Pl. Mot.) Hernandez met with Lopez several times and the meetings were tape recorded.[3]

Lopez arranged to have the money delivered to Hernandez by his girlfriend Alix Coba. On October 29, 1992, Ms. Coba delivered an initial $10,000 in cash in a shopping bag to Hernandez. (*See* 8/11/92 Report of Investigation at 4; United States Marshals Service ("USMS") Report of Investigation dated 10/29/1992, *attached as* Ex. 19 to Def. Opp'n & 2nd Def. Mot.; Criminal Compl. & Attached Aff. of U.S. Marshal Shawn Conboy ¶ 7, *attached as* Ex. 20 to Def. Opp'n & 2nd Def. Mot.) Approximately two weeks later, on November 11, 1992, Alix Coba was arrested while trying to deliver the rest of the money. Marshals seized the remaining $40,000 in a search of the Chevy van driven by Alix Coba. (*See* Conboy Report of Investigation dated 11/11/1992 at 2, *attached as* Ex. 2 (unnumbered page 10) to Pl. Mot.; *see also* Def. Separate Stmt. of Genuine Issues in Response to Pl.'s Stmt. of Mat. Facts Not in Dispute ¶ 8.) At some point, Hernandez provided the money to U.S. Marshal Shawn Conboy. It is undisputed

---

[3]There appears to be a disagreement over whether the tapes even still exist. However, as Lopez concedes that he attempted to buy his way out of prison, the missing tapes are immaterial to the disposition of the parties' summary judgment motions.

that Conboy has no recollection of anything Hernandez may have said to him when Hernandez gave him the money.

Based on Lopez's prior drug trafficking convictions, the Marshals Service suspected the $50,000 might be subject to forfeiture.  (Dep. of U.S. Marshal Shawn Conboy ("Conboy Dep.") at 18-20, *attached as* Ex. 10 to Def. Opp'n & 2nd Def. Mot.)  However, because the Marshals Service lacked seizure authority, it turned the money over to the DEA to determine whether forfeiture proceedings were appropriate.  (*See id.*; *see also* Def. Separate Stmt. of Genuine Issues in Response to Pl.'s Stmt. of Mat. Facts Not in Dispute ¶ 13.)   On or around January 26, 1993, Conboy delivered the $50,000 to DEA Special Agent Kevin Pederson.  According to Conboy, he told Pederson how the money came into the possession of the Marshals Service, and that any "actual forfeiture facts were up to [the] Drug Enforcement Administration."  (Conboy Dep. at 22.)

On or around January 27, 1993, Agent Pederson witnessed a Florida Highway Patrol dog named "Gator" alert to the smell of narcotic substance on the $50,000.   Agent Pederson subsequently seized the $50,000 and submitted the case for administrative forfeiture.  (*See* Record/Receipt of Asset Form at 1, *attached as* Ex. 9 to Pl. Mot.; DEA Form 453 at 3, *attached as* Ex. 10 to Pl. Mot.)  The DEA accepted the case for administrative forfeiture and issued a Notice of Seizure on March 1, 1993.  The DEA sent the notice to Lopez's last known home address and the Dade County Jail.   Lopez, however, was not incarcerated at the Dade County Jail.  Not surprisingly, both notices were returned to the DEA as undeliverable.  *See Lopez v. United States*, 201 F.3d 478, 480 (D.C. Cir. 2000).  The DEA also sent a notice of seizure to Ms. Coba, and published a notice in *USA Today*.  *Id.*  The Government received no response and in

3

May, 1993, declared the $50,000 forfeited.  *Id.*

Lopez first learned about the seizure and forfeiture from Ms. Coba a year later, in the Spring of 1994.  *Id.*  He immediately petitioned the DEA for the return of his money, but the DEA dismissed his claim as untimely.  *Id.*  Lopez sought review in this Court in 1996, which granted summary judgment in favor of the DEA on the grounds that it had satisfied its constitutional obligations to provide adequate notice.  *Id.*  On January 18, 2000, the D.C. Circuit reversed, holding that the DEA's notice was constitutionally inadequate.  *Id.* at 480-81.  The Circuit remanded the case to this Court for "further proceedings on the merits of Mr. Lopez's challenge to the forfeiture of his property."  *Id.* at 482.   On remand, the parties engaged in extensive discovery spanning several years.  Both sides have filed cross-motions for summary judgment, which are now ripe for decision.

## Analysis

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Once the moving party points to facts showing that there is an absence of evidence supporting the nonmoving party's case, the nonmoving party may not rest on mere allegations, but must point to specific facts in the record showing that there is a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   "[T]he mere scintilla of evidence in support of [the non-movant's] position will be insufficient; there must be evidence on which the jury could

reasonably find for the [non-moving] party." *Id.* at 252.  In considering a motion for summary

judgment, the "evidence of the non-movant is to be believed, and all inferences are to be drawn

in his favor." *Id.* at 255.  However, when the non-moving party bears the burden of proof at trial,

he or she must come forward with sufficient admissible evidence for a reasonable jury to find in

his or her favor.  *Celotex Corp.*, 477 U.S. at 322-24, 327.

I.      Standing

        The Government challenges Plaintiff's constitutional standing to contest the forfeiture of

the $50,000.[4]  As constitutional standing is a threshold question implicating the Court's

jurisdiction to even entertain Plaintiff's suit, the Court will address this issue first.  *See United*

*States v. Cambio Exacto, S.A.*, 166 F.3d 522, 526 (2d Cir. 1999) (noting that claimants bear the

burden of establishing both statutory and constitutional standing in order to contest a

governmental forfeiture).

        The fundamental inquiry for Article III standing is whether the claimant has alleged a

sufficiently personal stake in the outcome of the controversy to assure the court that the parties'

interests are truly adverse and that the court is "refereeing an actual, rather than a hypothetical,

dispute." *United States v. 5 S 351 Tuthill Road*, 233 F.3d 1017, 1023 (7th Cir. 2000); *see also*

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Cambio Exacto*, 166 F.3d at 527.

Respondents rightly note that the threshold burden for demonstrating Article III standing in

forfeiture proceedings is not rigorous.  A claimant need only show a "'facially colorable interest

in the proceedings sufficient to satisfy the case-or-controversy requirement and the prudential

_____

        [4]The Government only contests Plaintiff's constitutional standing under Article III to
challenge the forfeiture.  It concedes that Plaintiff has statutory standing.  (*See* Mem. in Support
of Def. Opp'n & 2nd Def. Mot at 6 n.1.)

considerations defining and limiting the role of the court.'" *United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 78 (2d Cir. 2002) (*quoting Torres v. $36,256.80 U.S. Currency*, 25 F.3d 1154, 1158 (2d Cir. 1994)).  "Courts generally do not deny standing to a claimant who is either the colorable owner of the *res* or who has any colorable possessory interest in it."  *United States v. Contents of Accounts Nos. 3034504504 & 144-07143*, 971 F.2d 974, 985 (3d Cir. 1992); *see also United States v. U.S. Currency, $81,000.00*, 189 F.3d 28, 35 (1st Cir. 1999).

At the pleading stage, a simple claim of ownership is sufficient to establish standing to contest a forfeiture.[5]  *United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491, 498-99 (6th Cir. 1998); *United States v. $191,910.00 in U.S. Currency*, 16 F.3d 1051, 1058 (9th Cir. 1994), *superseded by statute on other grounds*; *United States v. $138,381.00 in U.S. Currency*, 240 F. Supp. 2d 220, 231 (E.D.N.Y. 2003).  At the summary judgment stage, the claimant must generally support his claim of ownership with some additional evidence of his interest in the *res*.[6]

---

[5]A claimant need not assert an ownership interest in order to establish standing.  A lesser interest, such as a possessory interest will also suffice.  *See United States v. $260,242.00 U.S. Currency*, 919 F.2d 686, 687-88 (11th Cir. 1990) (constructive possession sufficient to establish constitutional standing); *United States v. Currency $267,961.07*, 916 F.2d 1104, 1107 (6th Cir. 1990) ("[a] property interest less than ownership, such as a possessory interest, is sufficient to create standing"); *Cambio Exacto*, 166 F.3d at 527 (explaining that courts "look to ownership and possession because they are often reliable indicators of injury that occurs when property is seized" as contrasted with 'straw' owners who hold title for someone else).

[6]While most courts require some additional evidence to support ownership, some courts have questioned whether requiring such evidence is appropriate in a civil forfeiture action.  In a civil forfeiture action, "it is the government's right to forfeiture that is the sole cause of action adjudicated.  If the government fails to meet its burden of proof . . . the claimant need not produce any evidence at all."  *United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 79 (2d Cir. 2002).  Thus, the Second Circuit has reasoned that a claimant need not prove the existence of his ownership interest because "[t]he function of standing in a forfeiture action is [] truly threshold only - to ensure that the government is put to its proof only where someone

*$515,060.42 in U.S. Currency*, 152 F.3d at 499; *$138,381.00 in U.S. Currency*, 240 F. Supp. 2d

at 231.   Thus, while bald allegations of ownership unsubstantiated by affidavits or other evidence

are insufficient, *see United States v. 38,570 U.S. Currency*, 950 F.2d 1108, 1112 (5th Cir. 1992);

*$138,381.00 in U.S. Currency*, 240 F. Supp. 2d at 233, "an allegation of ownership and some

evidence of ownership are together sufficient to establish standing to contest a civil forfeiture[,]"

*Torres*, 25 F.3d at 1158 (vacating district court's order granting summary judgment to the

government); *see also Cambio Exacto*, 166 F.3d at 527.

    Additional evidence sufficient to support a claim of ownership can include evidence of

actual title, possession or other evidence of dominion or control that indicates the existence of

some financial stake in the *res*.   *See United States v. Funds From Prudential Securities*, 300 F.

Supp. 2d 99, 107 (D.D.C. 2004) (discussing cases).   In *Torres v. $36,256.80 U.S. Currency*, for

example, the Second Circuit found that a claimant had provided sufficient evidence that she had

an ownership interest in a certificate of deposit that was only listed in her husband's name when

she provided a sworn statement that she had loaned her husband the $30,000 with which he

bought the CD in order to help him establish a credit history, and supported that claim with

---

with a legitimate interest contests the forfeiture." *Id.*; *cf. United States v. 5 S 351 Tuthill Road*, 233 F.3d 1017, 1023 (7th Cir. 2000) (reversing summary judgment grant and criticizing tests of straw ownership as improperly reaching the merits of forfeiture claims under the guise of constitutional standing); *United States v. One-Sixth Share of James J. Bulger in All Present and Future Proceeds of Mass Millions Lottery Ticket No. M246233*, 326 F.3d 36, 41 (1st Cir. 2003) (cautioning courts against conflating constitutional standing inquiry with merits determination on the forfeiture); *United States v. $80,760.00 in U.S. Currency*, 781 F. Supp. 462, 467 n. 15 (N.D. Tex. 1991) (explaining that requiring claimants to "show a 'legitimate source' for the purpose of establishing standing, improperly accelerates the claimant's ultimate burden").   Ultimately, however, the Court need not decide what quantum of evidence is necessary to establish Lopez's standing because he has provided sufficient additional evidence demonstrating that he has an ownership interest in the $50,000 with which he attempted to buy his way out of prison.

evidence that she had taken out a $30,000 consumer loan and that the bank disbursed the loan to claimant's husband at her request. *Torres*, 25 F.3d at 1156-57.

Courts have also found standing when the claimant asserts an ownership interest and the government's allegations indicate some involvement with the *res*. *See Funds From Prudential Securities*, 300 F. Supp. 2d at 107 (discussing cases). In *United States v. $38,570 U.S. Currency*, the court found standing based on claimant's assertion of ownership coupled with the government's allegations that the claimant "exercised some form of dominion over the currency." 950 F.2d at 1113. There, the police had seized the currency from the claimant's girlfriend, who was riding in the passenger seat of a rental car that the claimant was driving. *Id.* at 1110. Similarly, in *United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491, 499 (6th Cir. 1998), the court found standing where the claimant asserted ownership and the government's allegations indicated that the claimant had some involvement with the currency. In *$515,060.42 in U.S. Currency*, IRS and FBI agents seized over seven hundred thousand dollars in currency from the home of Virginia Hurst. *See* 152 F.3d at 495. Hurst was indicted and subsequently convicted of conspiring to conduct an illegal gambling operation. *Id.* In its complaint, the government alleged that Hurst and others operated illegal gambling schemes for several organizations, including the Jellinek Center, a not-for-profit organization that ran drug treatment and rehabilitation programs. *Id.* at 495-96. The Jellinek Center later contested the forfeiture, claiming that the bingo operations were legal and asserting that $149,075 of the currency seized from Hurst's home belonged to the organization. *Id.* at 499. Despite the fact that Jellinek provided no additional evidence of its ownership of that particular sum, the court found that its claim of ownership, together with the government's allegations regarding Jellinek's involvement

8

with the gambling scheme, were sufficient to establish standing.  *Id.*

In the present case, Lopez has provided more than sufficient evidence demonstrating a "colorable interest" in the $50,000 that he admittedly used in an attempt to bribe his way out of prison.  Since first learning of the forfeiture of his money, Lopez has consistently and repeatedly asserted a claim of ownership under oath, and has supported that claim with sworn answers to interrogatories and deposition testimony.  *See $557,933.89, More or Less, in U.S. Funds*, 287 F.3d at 79 n.10 (finding claim of ownership made under oath sufficient to establish Article III standing to contest forfeiture).  Additionally, the Government's own allegations demonstrate that Lopez controlled the payment of the $50,000 from prison:

> Q:      Now, in October or November, 1992, you attempted to escape from prison by arranging for $50,000 to be paid as a bribe to undercover agents, correct?
> A:      Yes.

(Dep. of Ramon Lopez at 14, *attached as* Ex. 3 to Pl. Reply; *see also* Aff. of Deputy U.S. Marshall Shawn Conboy, ¶ 4, *attached as* Ex. 1 to Pl. Mot. (stating that Lopez "made arrangements to escape from federal custody in return for a $50,000 payment"); Dep. of DEA Special Agent Pedersen at 4, *attached as* Ex. 8 to Pl. Mot. (admitting that the $50,000 seized from Alix Coba came from Lopez); Dep. of Deputy U.S. Marshall Shawn Conboy at 23, *attached as* Ex. 4 to Pl. Mot. (noting that Alix Coba, who attempted to deliver the cash, had no source of income other than Ramon Lopez); Government's Closing Argument in *United States v. Ramon Lopez and Alix Coba*, 92-708-CR-FAM, Trial Tr. vol. 7 at 27, 29-30, Sept. 30, 1993, *attached as* Ex. 1 to Pl. Reply (arguing that the $50,000 belonged to Lopez.))   Lopez's claim of ownership, made under oath, together with the Government's allegations that he arranged to have $50,000 delivered to secure his escape, is sufficient in and of itself to establish standing.  *See $515,060.42*

*in U.S. Currency*, 152 F.3d at 499; *$38,570 U.S. Currency*, 950 F.2d at 1113; *Funds From Prudential Securities*, 300 F. Supp. 2d at 107.

The Government's challenge to Lopez's standing centers largely on its claim that Lopez cannot prove he had the means to come up with $50,000.  However, Lopez's sworn supplemental responses to the Government's interrogatory requests and his deposition testimony indicate that he in fact had substantial financial assets with which he could have paid a $50,000 bribe. According to Lopez, he used the proceeds from the sale of personal, real estate and corporate assets, including a "tow truck, the limousine, the Triple R Company . . . a small boat, [and] a tractor-trailer" and his house on Kendale Lakes Blvd. ("Kendale Lakes property"), which he had previously quit-claimed to a Mr. Pedraja and a Mr. Cabrera as security for posting bond.  (*See* Pl.'s Second Supp. Responses to Def.'s Discovery Requests at 3-6, *attached as* Ex. 2 to Pl. Reply.)  Although Plaintiff has limited documentary evidence corroborating the sales,[7] the Government's Pre-Sentence Investigation Report ("PSI Report"), which was prepared in connection with Lopez's escape conviction, verifies Lopez's significant income and assets, as well as the sale of some of those assets.  (*See* Pl. Mot., Ex. 5 at 17-22.)   The PSI Report confirms that Lopez owned "Triple R Towing and Service Corporation" and that the corporation and tow truck were sold sometime in April 1991.  (*Id.* ¶ 55.)  The PSI Report also confirms that Alix Coba sold a "travel trailer" for $5,500 on November 9, 1992, just two days before she attempted to deliver the remaining $40,000.  (*Id.* ¶ 71.)

---

[7]In addition to having been in prison since 1991, Plaintiff claims that any remaining documents to which he may have had access were destroyed in August, 1992, by Hurricane Andrew.  (*See* Pl.'s Second Supp. Responses to Def.'s Discovery Requests at 5, *attached as* Ex. 2 to Pl. Reply.)

Additionally, among his other assets, Lopez was a one-third shareholder of Greenland

Brothers Farms, Inc., an S corporation in the state of Florida, from which he received dividend

income of nearly $18,000 and $19,000 in 1990 and 1989 respectively, and he was likely the true

owner of real estate nominally owned by the corporation.  (*Id.* ¶¶ 57-58, 60.)  His tax return

shows an adjusted gross income of $67,816.00 in 1990.  (*Id.* ¶ 72.)  According to the PSI Report,

by November of 1993, notwithstanding the fact that Lopez had been incarcerated for over two

years, he still had a net worth of nearly $75,000, not including the disputed Kendale Lakes

property.[8]

Thus, this case is unlike *United States v. $138,381.00 in U.S. Currency*, 240 F. Supp. 2d

---

[8]Lopez allegedly used a portion of the proceeds from the sale of his Kendale Lakes
property towards the $50,000 bribe.  It is undisputed that Lopez owned a house on Kendale
Lakes Boulevard that was worth somewhere between $120,000 and $132,000.  It is also
undisputed that Lopez quit-claimed the deed to the house to Raul Cabrera and Osvaldo de la
Pedraja, Jr. in 1990 as security for posting his bond when Lopez was first charged with drug
trafficking.  Mr. Cabrera confirmed the verbal agreement by which he posted a $60,000
certificate of deposit as collateral for Lopez's bond and Lopez quit-claimed the deed to the
Kendale Lakes property as security.  (*See* Dep. of Raul D. Cabrera at 85-89, *attached as* Ex. 6 to
Def. Opp'n & 2nd Def. Mot.)  Cabrera also confirmed that when the CD that he had posted was
released, he no longer had any interest in the house, pursuant to the verbal agreement.  (*Id.*; *see
also* Dep. of Ramon Lopez at 106, *attached as* Ex. 1 to Dep. Opp'n & 2nd Def. Mot.)  He
subsequently quit-claimed his interest in the property to Mr. Ruiz-Moya, a relative of Mr.
Pedraja, at the request of Mr. Pedraja.  (*Id.* at 89-90; *see also* PSI Report ¶ 70.)  According to
Lopez, after he was convicted and sentenced to twenty years in prison, he agreed to sell the
property outright.  (*See* Lopez Dep. at 106.)  Lopez claims that he ultimately received $80,000 for
the property.  (*Id.* at 107-08.)  He further testified that he received this money in installments,
with an initial payment of $40,000 or $50,000 made in September or October of 1992.  (*Id.* at
108, 111.)  Lopez testified that he does not remember who delivered the money (in cash) to Alix
Coba, but believes it was either Pedraja, Cabrera or another individual, Alberto Trujillo.  (*Id.* at
111-12.)  The Government relies heavily on Cabrera's deposition testimony that he personally
never transferred any money in connection with the Kendale Lakes property.  However, in light
of the existing evidence of Lopez's connection to the $50,000, the Court need not resolve the
question of whether any of the three men connected to the Kendale Lakes property - Cabrera,
Pedraja or Ruiz-Moya - paid Lopez $80,000.

220, 231-32 (E.D.N.Y. 2003) on which the Government so heavily relies.   In *$138,381.00*, Jose

Agudelo-Garcia was arrested for failing to declare over $130,000 in currency while traveling

from New York City to Bogota, Columbia.  *See* 240 F. Supp. 2d at 223.  At the time of his arrest,

Agudelo-Garcia admitted that the money was not his, that he was transporting it for others and

that he did not know how much he was carrying.  *Id.* at 223-24.  Two years later, Mr. Agudelo-

Garcia filed a notice contesting the forfeiture.  Again, he "did not assert that he was the owner of

the defendant *in rem*, but rather that he was lawfully in possession of the currency."  *Id.* at 224.

Several weeks later, Mr. Agudelo-Garcia filed an amended notice of claim alleging that he and

his wife, Yolanda Castro, were the lawful owners.  *Id.*  The court granted summary judgment to

the government with respect to Mr. Agudelo-Garcia's claim because he failed to file an

opposition to the government's motion for summary judgment and more importantly, because he

was deemed a "fugitive from justice" and was barred from using the courts of the United States

in any related matter.  *Id.* at 225-226.

    With respect to Ms. Castro's claim, the court held that she lacked standing to challenge

the forfeiture because her ownership claim was not signed or verified under oath, *id.* at 229,

because she had provided absolutely no evidence whatsoever in support of her claim of

ownership and because the government had provided substantial evidence that Mr. Agudelo-

Garcia and Ms. Castro lacked the financial means to accumulate $138,381, *id.* at 231-32.

Notably, the government in *$138,381.00 in U.S. Currency* provided evidence showing that Mr.

Agudelo-Garcia's annual income was only $19,000, that he brought no money or assets with him

into the United States and that his annual expenses totaled between $13,700 and $16,300.  *Id.* at

232.  Ms. Castro's annual income from 1991 to 1997 ranged from approximately $1,100 to

$16,500.  *Id.*  Ms. Castro did nothing to rebut the government's substantial evidence

demonstrating that she lacked the financial means to even come close to accumulating

$138,831.00.  *Id.*  Furthermore, Ms. Castro was not charged in the criminal matter, nor did the

government's allegations contain any suggestion that she was involved in Mr. Agudelo-Garcia's

scheme to transport currency into Columbia.   Here, by contrast, the Government concedes that

Mr. Lopez arranged to pay $50,000 to a U.S. Marshal in an attempt to buy his way out of prison.

The only other individual known to be involved in the scheme has testified that the money

belonged to Lopez.  Additionally, unlike the financial situation of the claimants in *$138,381.00*

*in U.S. Currency*, Lopez had substantial assets from which he presumably could have come up

with $50,000 to use as a bribe.

Article III standing requires only a "colorable interest" in the seized property, which

Lopez has established.  Requiring Lopez to trace every dollar back to a legitimate source would

"improperly accelerate[] [his] ultimate burden" to demonstrate that the funds are not connected to

illegal drug activity.  *$80,760.00 in U.S. Currency*, 781 F. Supp. at 467 n. 15; *see also*

*$557,933.89, More or Less, in U.S. Funds*, 287 F.3d at 79*; One-Sixth Share of James J. Bulger in*

*All Present and Future Proceeds of Mass Millions Lottery Ticket No. M236233*, 326 F.3d at 41.

The Court will therefore proceed to address the merits of the parties' claims for summary

judgment.

II.        $10,000 Voluntarily Surrendered by Alix Coba

The Court agrees with Defendants that *United States v. Farrell*, 606 F.2d 1341, 1348-50

(D.C. Cir. 1979), precludes the return of any funds that Plaintiff voluntarily provided to the

Government, as opposed to any money that was seized.  An individual who voluntarily delivers

property pursuant to an illegal contract may not later seek the assistance of the courts to compel

the return of that property.  *See Farrell*, 606 F.2d at 1348-49; *see also Mantilla v. United States*,

302 F.3d 182, 186-87 (3d Cir. 2002), *cert. denied*, 538 U.S. 969 (2003); *United States v. Kim*,

738 F. Supp. 1002, 1004-05 (E.D. Va. 1990).  Because the record clearly establishes that Alix

Coba voluntarily handed over $10,000 to the U.S. Marshals Service in an attempt to secure

Plaintiff's release from prison, Defendants are entitled to summary judgment with respect to this

particular portion of the $50,000.

In *Farrell*, the court upheld the general rule that the government may not confiscate

"derivative contraband without statutory authorization[,]"[9] 606 F.2d at 1345, but distinguished

property that had been "voluntarily surrendered," *id.* at 1350.  The plaintiff in *Farrell* sought the

return of $5,000 he had given to an undercover agent in an attempt to purchase heroin.  At the

time, property subject to forfeiture for use in connection with illegal drug transactions was

limited to contraband *per se*, e.g., the drugs themselves.  *See* 21 U.S.C. § 881(a) (1976).  The

statute did not provide for forfeiture of moneys used to purchase illegal drugs.  The *Farrell* court

recognized the lack of statutory authority to retain the $5,000, but nonetheless refused to return

the funds to the plaintiff under the long-standing common law rule that property delivered under

an illegal contract cannot be recovered by a party *in pari delicto*.  *Id.* at 1347-48.

In 1978, Congress amended the forfeiture laws to require forfeiture of any funds traceable

to an illegal drug transaction:

> The following shall be subject to forfeiture to the United States and no property right
> shall exist in them: . . .

---

[9]Derivative contraband is property that has been used in an illegal manner, but is not itself
inherently illegal.  *Farrell*, 606 F.2d at 1344.

14

(6) All moneys . . . furnished or intended to be furnished by any person in exchange for a controlled substance . . . all proceeds traceable to such an exchange.

*See* Psychotropic Substances Act of 1978, Pub. L. No. 95-633, § 301(a), 92 Stat. 3768 (codified as amended at 21 U.S.C. § 881(a)(6)).

Plaintiff argues that the 1978 amendments to the forfeiture laws operate to limit application of the *Farrell* rule.  It is well-established rule that courts "cannot 'ignore the judgment of Congress, deliberately expressed in legislation.'" *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) (rejecting implied medical necessity defense where statute did not provide for one) (*quoting Virginian R. Co. v. Railway Employees*, 300 U.S. 515, 551 (1937)).  Plaintiff argues that because Congress has mandated the forfeiture of all funds traceable to illegal drug transactions and provided the procedures by which such forfeiture shall take place, it would be error for the Court to augment the statute by applying common law principles such as *In pari delicto*.  In support, Plaintiff points to the fact that the D.C. Circuit "has not apparently embraced the 'Farrell doctrine' in any case since the 1978 change in the forfeiture laws."  (1st Pl. Opp'n at 7.)

Had Plaintiff paid the money in connection with an illegal drug exchange, the Court might agree.  The illegal contract at issue, however, was not related to any controlled substance.  Plaintiff, through Alix Coba, paid an undercover agent $10,000 in an attempt to escape from prison.  The statute makes no provision for the forfeiture of moneys used in connection with an attempted escape.  Thus, even if the 1978 amendments supplanted *Farrell* as applied to funds used in connection with illegal drug transactions, *Farrell's* reasoning remains good law for illegal contracts not encompassed within the forfeiture laws.  The fact that no statute provides for

15

the forfeiture of funds seized as instrumentalities of felony attempted escape is not a bar to the application of the common law principle that courts will leave parties to an illegal contract as they find them.  *See Farrell*, 606 F.2d at 1350; *see also Kim*, 738 F. Supp. at 1004 (applying *Farrell* and refusing to return money used in payments of a gratuity to a public official).

It is true that the Government seized and forfeited the entire $50,000 pursuant to the authority of the drug forfeiture statute, 21 U.S.C. § 881(a)(6).  Plaintiff argues that by electing to proceed under the forfeiture statute in 1993, Defendants have chosen their remedy and, under the doctrines of equitable estoppel and laches, should be barred from asserting the *Farrell* rule as a defense more than ten years later.  The Court is mindful of the concern that permitting the Government to disclaim the very forfeiture proceedings it has been attempting to enforce since 1996 could mean that the parties, this Court and the D.C. Circuit have been engaged in a "fool's errand" for the past ten years, wasting countless time, energy and resources.  However, the Court does not believe that the doctrines of laches or equitable estoppel properly apply to this case.

"The doctrine of laches bars relief to parties who 'delay the assertion of their claims for an unreasonable time.'" *United States v. Phillip Morris Inc.*, 300 F. Supp. 2d 61, 72 (D.D.C. 2004) (*quoting NAACP v. NAACP Legal Def. & Educ. Fund, Inc.*, 753 F.2d 131, 137 (D.C. Cir. 1985)).  However, laches is not generally available as a defense against the United States.  *See United States v. Summerlin*, 310 U.S. 414, 416 (1940); *Phillip Morris*, 300 F. Supp. 2d at 72-74. The narrow exceptions to this rule apply when the government is acting in a commercial context, i.e., when the government acts as any other participant in the marketplace.  *See Clearfield Trust Co. v. United States*, 318 U.S. 363, 369 (1943) (laches may apply when government "does business on business terms").  Here, however, the government is acting in a law enforcement

16

capacity.  Where the government acts pursuant to its power to protect the public interest, laches

does not apply.  *See Phillip Morris*, 300 F. Supp. 2d at 73 (recognizing continued viability of

"*Summerlin* rule"); *United States ex rel. Purcell v. MWI Corp.*, 254 F. Supp. 2d 69, 74 n.2

(D.D.C. 2003) (same).

The doctrine of equitable estoppel is similarly inapplicable.  As an initial matter, it is

unclear whether the doctrine of equitable estoppel may even be asserted against the government.

*See Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 422-23 (1990) (declining to decide the

question but noting that "we have reversed every finding of estoppel that we have reviewed");

*Heckler v. Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 60 (1984).  Even

assuming the doctrine is available, Plaintiff cannot meet the very high burden required to assert

estoppel against the Government.  In addition to the four traditional elements of estoppel - 1)

false representation, 2) a purpose to invite action by the party to whom the representation was

made, 3) ignorance of the true facts by that party and 4) reliance - Plaintiff must also demonstrate

"a showing of injustice . . . and a lack of undue damage to the public interest."  *ATC Petroleum,*

*Inc. v. Sanders*, 860 F.2d 1104, 1111 (D.C. Cir. 1988) (internal quotation and citations omitted).

Plaintiff claims that by belatedly attempting to retain his money under the *Farrell* rule,

the Government implicitly concedes that the forfeiture proceedings it pursued for ten years have

been a sham.  The Court does not agree that articulating a new legal theory, however late in the

case, constitutes the type of "definite misrepresentation" required for equitable estoppel.  *See*

*Graham v. SEC*, 222 F.3d 994, 1007 (D.C. Cir. 2000) (rejecting argument that SEC investigation

into trading activity constituted a representation regarding the propriety of the trades); *Phillip*

*Morris*, 300 F. Supp. 2d at 71 (rejecting argument that by regulating the tobacco industry,

government had implicitly approved of industry's conduct, foreclosing any liability under RICO statutes).

Furthermore, Plaintiff cannot demonstrate that foreclosing the Government from raising the *Farrell* rule would not result in any "undue damage to the public interest." *ATC Petroleum*, 860 F.2d at 1111. "If . . . it is sound public policy to deny the use of the courts to persons . . . who seek the return of illegally paid money," *Farrell*, 606 F.2d at 1350, then it must also be said that permitting Plaintiff to evade this well-established rule on grounds of estoppel would damage the public interest. Defendants are therefore entitled to summary judgment with respect to the $10,000 voluntarily surrendered in an illegal contract. Because *Farrell* is inapplicable to the remaining $40,000, the Court will proceed to address the merits of the Government's forfeiture.

III.     $40,000 Seized by the U.S. Marshal's Service

Plaintiff contends that the only appropriate remedy for the Government's constitutionally deficient notice is the return of his money. He argues that there is no longer any proceeding by which the Government may lay claim to his money; the constitutionally deficient notice voids the administrative forfeiture and that the statute of limitations for initiating judicial forfeiture proceedings expired on or around January 27, 1998. Plaintiff also argues that the Government's failure to provide him with a timely hearing violated his due process rights such that the only meaningful remedy is the return of his money. Finally, Plaintiff argues that the he is entitled to summary judgment because the DEA cannot demonstrate probable cause to believe the money was traceable to an illegal drug transaction. The Government recognizes that the statute of limitations has long since expired, but nevertheless contends that Plaintiff's sole remedy is the

18

same hearing on the merits to which he would have been entitled had the government properly

initiated judicial forfeiture proceedings prior to January 26, 1998.

     A.     Proper remedy when administrative forfeiture found void for constitutionally
            inadequate notice.

    Federal law authorizes the civil forfeiture[10] of moneys traceable to an illegal drug

transaction.  Ordinarily, the Government may not forfeit seized property absent a judicial

determination that the property is subject to forfeiture.  Additionally, the Government must

initiate judicial forfeiture proceedings within five years of learning of the alleged offense that

gives rise to the forfeiture.  *See* 19 U.S.C. § 1621 (2000).  However, when the Government seizes

certain property, including monetary instruments, valued at less than $500,000, they may forego

judicial proceedings and proceed by administrative forfeiture.  *See* 19 U.S.C. §§ 1607-1609.[11]

    "Administrative forfeiture is a device that permits the United States to . . . take ownership

[of property in its custody] without the trouble and expense of court proceedings."  *Small v.*

*United States*, 136 F.3d 1334, 1335 (D.C. Cir. 1998).   It is "conducted wholly outside the

judicial system" and consists of no more than notice by the Government that it intends to forfeit

---

    [10]Civil forfeiture traces its roots to the early English law of deodands (meaning "given to
God"), which viewed inanimate objects that caused harm to another (whether accidentally or
purposefully) as an "accursed thing" subject to forfeiture as atonement for sudden death.  *See*
*United States v. 785 St. Nicholas Ave.*, 983 F.2d 396, 401-02 (2d Cir. 1993) (discussing historical
origins of civil forfeiture); *see also* Jimmy Gurulé, Sandra Guerra Thompson & Michael O'Hear,
The Law of Asset Forfeiture § 1 (2004) (tracing history of civil forfeiture).  Modern asset
forfeiture in the United States has emerged as a favored weapon in the 'war on drugs.' *See United*
*States v. Daccarett*, 6 F.3d 37, 46 (2d Cir. 1993) (recognizing government's reliance on civil
forfeiture statutes because of the ease with which property may be seized); *United States v.*
*$191,910.00 in U.S. Currency*, 16 F.3d 1051, 1069 (9th Cir. 1994) (noting 1500 per cent increase
in federal asset forfeitures between 1985 and 1990).

    [11]The procedures apply by their terms to forfeitures conducted by customs officials, but
are incorporated by reference in 21 U.S.C. § 881(d).

the property, followed by default on the part of the party whose property has been seized.  *See Kadonsky v. United States*, 216 F.3d 499, 503 (5th Cir. 2000).  The government initiates administrative forfeiture proceedings by sending out a notice to persons with an interest in the seized property.  The government completes administrative forfeiture when the interested party fails to contest forfeiture within a certain period of time.[12]  *See Kadonsky*, 216 F.3d at 503; *United States v. Dusenbery*, 201 F.3d 763, 765-66 (6th Cir. 2000).  An administrative forfeiture has the same force and effect as a final decree and order of forfeiture in a judicial forfeiture proceeding.  *See* 19 U.S.C. 1609(b); *see also $557,933.89, More or Less, in U.S. Funds*, 287 F.3d at 72 n.1.  If, however, an individual with an interest in the property contests the forfeiture, the government is barred from proceeding administratively and must initiate judicial forfeiture proceedings in federal court.[13]  *Kadonsky*, 216 F.3d at 503.

Virtually every circuit to address the question agrees that an administrative forfeiture based on constitutionally inadequate notice is void and without legal effect.  *See Longenette v.*

---

[12] In 1993, when the government forfeited the $50,000 in question, the statute required an interested party to contest the forfeiture within 20 days by filing a bond in the amount of $5000 or 10% of the value of the claimed property, whichever was less, but in no event less than $250. 19 U.S.C. § 1608 (1988).  The *Civil Asset Forfeiture Reform Act of 2000* (CAFRA) eliminated the bond requirement and extended the time frame in which an interested party may contest notice of forfeiture. P.L. No. 106-185, § 2, 114 Stat. 202, 204 (April 25, 2000) (codified at 18 U.S.C. § 983).

[13] At the time the DEA forfeited Plaintiff's money, the initial burden in judicial forfeiture proceedings was on the Government to show probable cause for the forfeiture.  *See* 19 U.S.C. § 1615 (superseded by statute 2000).  Once the Government made this initial showing, the burden switched to the claimant to prove that the property was not subject to forfeiture.  *Id.*; *see also Kadonsky*, 216 F.3d at 503.  For judicial forfeiture proceedings commenced on or after August 23, 2000, however, the Government must prove by a preponderance of the evidence that the property is subject to forfeiture.  *See* Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), Pub. L. No. 106-185, §§ 2(a), 21, 114 Stat. 202, 205-06, 225 (codified at 18 U.S.C. § 983(c)(1) (2000)); *see also $557,933.89 More or Less, In U.S. Funds*, 287 F.3d at 76 n.5.

*Krusing*, 322 F.3d 758, 765-66 (3d Cir. 2003); *Alli-Balogun v. United States*, 281 F.3d 362, 369-71 (2d Cir. 2002); *Kadonsky*, 216 F.3d at 506-07; *United States v. Marolf*, 173 F.3d 1213, 1216-18 (9th Cir. 1999); *Clymore v. United States*, 164 F.3d 569, 573-74 (10th Cir. 1999) (*Clymore I*); *United States v. Volanty*, 79 F.3d 86, 88 (8th Cir. 1996); *United States v. Giraldo*, 45 F.3d 509, 512 (1st Cir. 1995); *but see United States v. Dusenbery*, 201 F.3d 763, 768 (6th Cir. 2000) (holding inadequately noticed forfeiture was "voidable").

The Court agrees with the reasoning of the vast majority of the circuits holding administrative forfeitures based on constitutionally inadequate notice are properly viewed as void, rather than voidable. Notice, followed by default, is the sum total of administrative forfeiture; if no constitutionally adequate notice was ever sent, then the administrative forfeiture never legally happened. *Cf. Combs v. Nick Garin Trucking*, 825 F.2d 437, 442 (D.C. Cir. 1987) (explaining that default judgment entered without proper service of process is void and without legal effect because court lacked jurisdiction to enter judgment).

When an administrative forfeiture is declared void for lack of constitutionally adequate notice, the usual remedy is to remand the case to permit the Government to initiate judicial forfeiture proceedings. *See Volanty*, 79 F.3d at 88 (instructing district court to "'set aside the forfeiture Declaration and order DEA either to return [the] property or commence judicial forfeiture in the district court'") (*quoting United States v. Woodall*, 12 F.3d 791, 795 (8th Cir. 1993)); *Giraldo*, 45 F.3d at 512 (remanding for determination of adequacy of notice and explaining that "[i]f the notice turns out to have been inadequate, the forfeiture is void" and instructing the district court to set aside the declaration of forfeiture and either "order the Customs Service to return the money to Giraldo or to begin judicial forfeiture in the district

21

court").  Here, however, the statute of limitations for initiating forfeiture proceedings expired

nearly eight years ago.  Thus, the statute of limitations would ordinarily bar the Government from

instituting judicial forfeiture proceedings at this stage, absent an argument for tolling.[14]  *See*

*Kadonsky*, 216 F.3d at 506; *Clymore I*, 164 F.3d at 574.

Defendants argue that by remanding the case "for further proceedings on the merits of

Mr. Lopez's challenge to the forfeiture of his property," *Lopez*, 201 F.3d at 482, the D.C. Circuit

has in fact joined the Sixth Circuit in holding that administrative forfeitures based on

constitutionally inadequate notice are merely voidable, thereby relieving the Government of its

burden to institute judicial forfeiture proceedings within the statute of limitations.  *See*

*Dusenbery*, 201 F.3d at 766-68.  The Government points to *Small v. United States*, 136 F.3d

1334, 1338 (D.C. Cir. 1998) as support for the proposition that the D.C. Circuit views

administrative forfeitures based on constitutionally inadequate notice as voidable rather than

void.  In *Small*, the court found that the government's notice was constitutionally inadequate and

"invalidate[d] the forfeiture."  136 F.3d at 1338.  In remanding the case with instructions to

"grant Small a hearing on the merits of the forfeiture," the court cited to *Boreo v. DEA*, 111 F.3d

301, 307 (2d Cir. 1997).  *Id.*  Because some courts had interpreted *Boreo* as implicitly supporting

the view that administrative forfeitures based on constitutionally inadequate notice are voidable

rather than void, *see, e.g., Dusenbery*, 201 F.3d at 767, the Government argues that the D.C.

---

[14]For forfeiture proceedings initiated on or after August 23, 2000, CAFRA amended the statute of limitations provision to prevent precisely the situation now facing this Court.  Under CAFRA, a person entitled to notice in an administrative forfeiture proceeding who does not receive notice, may file a motion to set aside the administrative forfeiture.  *See* 18 U.S.C. § 983(e).  If the motion is granted, the Government may initiate judicial forfeiture proceedings within six months of the order granting the motion.  *See* 18 U.S.C. § 983(e)(2).

Circuit's citation to *Boreo* should similarly be read as approval of this approach.

The Court does not agree that the Circuit's one-sentence remand instruction in this case even reaches, much less decides, such complex issues.  Two additional problems arise with the Government's reading of *Small*.  First, the issue of whether constitutionally inadequate notice voids an administrative forfeiture, or merely makes it "voidable," and the consequences that flow therefrom, was not before the court in *Small*.  Second, *Boreo*, to which the D.C. Circuit cited in remanding *Small*, has since been abrogated and is no longer good law on the this particular issue. *See Alli-Balogun v. United States*, 281 F.3d 362, 369-72 (2d Cir. 2002) (rejecting reading of *Boreo* as holding that inadequately noticed forfeitures were voidable rather than void).  Indeed, the circuits are now nearly unanimous in the view that constitutionally inadequate notice voids the resulting administrative forfeiture.  To hold otherwise, would "make[] the limitations period into a period that limits nothing." *Alli-Balogun*, 281 F.3d at 370.  The civil forfeiture statute grants enormous power to the Government to declare private property seized with virtually no process whatsoever.  The only requirement that the statute imposes on the Government is that it provide adequate notice to the person whose property it is seizing.  The Sixth Circuit's approach excuses the Government's failure to do the only act required of it by the statute.

This is not to say that Lopez is automatically entitled to the return of the seized $40,000. Although the Government has not raised this argument, equitable principles might apply to toll the statute of limitations.[15]  *See Kadonsky*, 216 F.3d at 506-07 (holding that "the remedy for constitutionally insufficient notice in [administrative] forfeiture proceedings is to void and vacate

---

[15]The statute provides for tolling in certain defined situations not applicable here.  *See* 19 U.S.C. § 1621.

the original proceedings, and [the statute] of limitations may bar consideration of the government's forfeiture claim on the merits unless the government provides a rationale to equitably toll or otherwise not apply the statute"); *Clymore I*, 164 F.3d at 574 (vacating administrative forfeiture for lack of constitutionally adequate notice and remanding to district court to determine whether government had any defenses to the statute of limitations); *Marolf*, 173 F.3d at 1217-18 (inadequately noticed forfeitures are void and government may not initiate judicial forfeiture proceedings after expiration of the limitations period; government must return property, absent application of laches or principles of equitable tolling); *Longenette*, 322 F.3d at 767 (tolling statute of limitations on equitable grounds).

Alternatively, some circuits permit the Government to attempt to quiet title to the disputed property by opposing a claimant's Rule 41(g) (formerly Rule 41(e)) or other civil equitable motion for return of the property.[16]  *See Alli-Balogun*, 281 F.3d at 371-72; *United States v. Clymore*, 245 F.3d 1195, 1999-1201 (10th Cir. 2001) (*Clymore III*); *Concepcion v. United States*, 298 F. Supp. 2d 351, 355-56 (E.D.N.Y. 2004); *cf. Kadonsky*, 216 F.3d at 507 (permitting government to pursue its compulsory counterclaim for recoupment raised during pendency of claimant's suit).  In such situations, however, the Government "loses the benefit of the presumptions it would have enjoyed if the claimant had been given notice of the forfeiture

---

[16]Generally speaking, "the government is permitted to seize evidence for use in investigation and trial, but [] such property must be returned once criminal proceedings have concluded, unless it is contraband or subject to forfeiture." *United States v. Chambers*, 192 F.3d 374, 376 (3d Cir. 1999).  Federal Rule of Criminal Procedure 41(g) (previously Rule 41(e)) is a device by which an individual may petition the court for return of property while criminal proceedings are still ongoing. *Id.*  While criminal proceedings are still ongoing, "the burden is on the movant to show that he or she is entitled to the property." *Id.* at 377.  Once criminal proceedings have terminated, however, the burden shifts to the government to demonstrate that it has the right to retain the property, e.g., the property is contraband or subject to forfeiture. *Id.*

and timely filed a claim judicially contesting such forfeiture." *See Alli-Balogun*, 281 F.3d at 372;

*Clymore III*, 245 F.3d at 1201.  As noted previously, at the time the DEA forfeited Plaintiff's

money, the initial burden in judicial forfeiture proceedings was on the Government to show

probable cause for the forfeiture.  Once the Government made this initial showing, the burden

switched to the claimant to prove by a preponderance of the evidence that the property was not

subject to forfeiture.  In a Rule 41(g) motion, however, once criminal proceedings have ended,

the Government bears the burden of demonstrating that the property is contraband or subject to

forfeiture.[17]  *See United States v. Chambers*, 192 F.3d 374, 377 (3d Cir. 1999); *Clymore III*, 245

F.3d at 1201.

Ultimately, however, the Court need not reach the question of whether the statute of

limitations should be equitably tolled or, alternatively, whether the Court should treat Plaintiff's

lawsuit as a Rule 41(g) motion filed after the close of criminal proceedings.  In either case, the

burden is on the Government to show by a preponderance of the evidence that the $40,000 is

subject to forfeiture.  This is a burden the Government cannot meet.

As already noted, assuming the Court were to treat Plaintiff's claim as a Rule 41(g)

motion, the Government would retain the right to oppose the motion by showing it is entitled to

retain the property, but would lose the benefit of any statutory burdens of proof and would bear

the burden of showing that the property is subject to forfeiture.  *See Alli-Balogun*, 281 F.3d at

371-72; *Clymore III*, 245 F.3d at 1201.  Alternatively, were the Court to equitably toll the statute

of limitations and permit the Government to initiate judicial forfeiture proceedings at this late

---

[17]A Rule 41(g) motion for return of property made after the close of criminal proceedings
is treated as a civil proceeding for equitable relief.  *See Chambers*, 192 F.3d at 376.

date, CAFRA's heightened burden of proof would apply.  In any forfeiture proceeding "commenced" on or after August 23, 2000, the burden is on the Government to show by a preponderance of the evidence that the property is subject to forfeiture.  *See* Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), Pub. L. No. 106-185, §§ 2(a), 21, 114 Stat. 202, 205-06, 225 (codified at 18 U.S.C. § 983(c)(1) (2000)); *United States v. $80,180.00 in U.S. Currency*, 303 F.3d 1182, 1186 (9th Cir. 2002) (holding that judicial forfeiture proceedings "commence" with the filing of a complaint).  Administrative and judicial forfeitures are "separate proceedings."  *See Longenette*, 322 F.3d at 767.  Moreover, to rely on the initiation of administrative forfeiture proceedings to determine CAFRA's applicability would improperly give some legal effect to a void proceeding.  Thus, regardless of the type of hearing on the merits the Court provides, the Government bears the burden of showing that the property is subject to forfeiture.

      B.      Whether the $40,000 is traceable to illegal drug activities

Seized money is subject to forfeiture if it is "furnished or intended to be furnished by any person in exchange for a controlled substance . . . traceable to such an exchange, . . . . or used or intended to be used to facilitate a violation of federal drug laws."  21 U.S.C. § 881(a)(6).  In any hearing on the merits, the Government must show by a preponderance of the evidence that there is a "substantial connection" between the $40,000 and illegal drug activity.  *See* 21 U.S.C. § 983(c)(3); *see also United States v. Funds in the Amount of $30,670.00*, 403 F.3d 448, 454 (7th Cir. 2005).  Upon review of the affidavits, deposition testimony and the entire record evidence submitted in support of the parties' cross-motions for summary judgment, the Court finds that no reasonable jury could find for the Government.  Summary judgment in favor of the Plaintiff is

appropriate with respect to the $40,000 because there is no genuine issue of material fact by which a jury could reasonably find, by a preponderance of the evidence, that there is a "substantial connection" between the $40,000 and a drug trafficking offense.  Indeed, even under the pre-CAFRA probable cause standard, it is an extremely close question.

The Government relies on four factors that allegedly tie the $40,000 to drug trafficking:[18] 1) that Lopez has been twice convicted for drug trafficking and is presently serving two concurrent 240-months terms of confinement and two concurrent life sentences, 2) that a Florida Highway Patrol canine allegedly alerted to the scent of narcotics on the money, 3) that Lopez allegedly admitted that he had no income or assets not derived from illegal drug activity, and 4) that a substantial portion of the money consisted of small denominations, primarily $10 and $20 bills.[19]  (*See* Mem. in Support of Def. Opp'n & 2nd Def. Mot. at 18-20.)  The Court will treat each in turn before assessing the totality of the evidence.

### 1.    Lopez's Drug Trafficking Convictions

Lopez's drug trafficking convictions constitute "a highly probative factor in the forfeiture calculus." *United States v. $67,220.00 in U.S. Currency*, 957 F.2d 280, 286 (6th Cir. 1992).  However, a history of drug trafficking, standing alone, does not even establish probable cause, much less establish by a preponderance of the evidence, that the $40,000 at issue here had a

---

[18]CAFRA amended the forfeiture statute to permit the Government to use evidence obtained after the filing of the complaint.  *See* 18 U.S.C. § 983(c)(2).

[19]The Government's Rule 30(b)(6) witness also listed the fact that the money was provided in an escape attempt as evidence that the funds were traceable to illegal drug activity. (*See* Rule 30(b)(6) Dep. of Vicki L. Rashid at 52, *attached as* Ex. 18 to Def. Opp'n & 2nd Def. Mot.)  The Court fails to see how Lopez's attempted escape from prison connects the funds used in that attempted escape to drug trafficking.  In any event, the Government in its briefing does not appear to rely on Lopez's attempted escape as evidence supporting forfeiture.

substantial connection to drug activity.  Rather, there must be some additional evidence

demonstrating a "sufficient connection between the [] narcotics activity and the particular assets"

the Government seeks to forfeit.  *United States v. $405,089.23 U.S. Currency*, 122 F.3d 1285,

1290-91 (9th Cir. 1997) (finding existence of large sums of money combined with evidence that

claimants managed a large narcotics operation insufficient failed to establish probable cause

under pre-CAFRA standard); *United States v. All Assets and Equip. of W. Side Bldg. Corp.*, 58

F.3d 1181, 1189 (7th Cir. 1995) (finding history of drug trafficking sufficient to establish

probable cause when combined with enormous discrepancy between claimant's "verifiable

income" and the "level of wealth displayed"); *United States v. $80,760.00 in U.S. Currency*, 781

F. Supp. 462, 478 (N.D. Tex. 1991) (finding government lacked probable cause when evidence

consisted of agent's conclusion that claimant met "drug-courier profile" and positive canine alert

to narcotics residue).

      2.     The canine alert

     The alleged canine alert has limited probative value.  It is well-established that an

extremely high percentage of all cash in circulation in the United States is contaminated with

drug-residue sufficient to alert a trained dog.  *See United States v. $639,558 in U.S. Currency*,

955 F.2d 712, 714 n.2 (D.C. Cir. 1992) (questioning accuracy of dog alerts and noting that

between 70 and 90 percent of all cash in circulation is contaminated with narcotics residue);

*United States v. $506,231 in U.S. Currency*, 125 F.3d 442, 453 (7th Cir. 1997) (refusing "to take

seriously the evidence of the post-seizure dog sniff"); *Muhammed v. DEA*, 92 F.3d 648, 653 (8th

Cir. 1996) (discounting government's argument that dog alert constituted probable cause

supporting administrative forfeiture due to the high percentage of currency contaminated with

drug residue); *United States v. U.S. Currency, $30,060.00*, 39 F.3d 1039, 1042-43 (9th Cir. 1994)

(holding that dog alert, standing alone, is insufficient to establish probable cause that currency

had a substantial connection to illegal drug activities).  Indeed, the Government appears to

concede that a positive dog alert, standing alone, is insufficient evidence to even establish

probable cause.  (*See* Mem. in Support of Def. Opp'n & 2nd Def. Mot. at 20 (arguing that trained

dog alert retains some probative value when viewed in connection with other evidence); *see also*

Rashid Dep. at 82 (conceding that positive dog alert does not necessarily connect currency with

illegal drug activities.))

Furthermore, the Government is unable to provide any evidence regarding the

circumstances of the dog alert.[20]  Agent Pederson's Report of Investigation states that on January

27, 1993, he witnessed a Florida Highway Patrol dog named Gator positively alert to the small of

narcotics on the $50,000.  (*See* Pederson Report of Investigation at 2, *attached as* Ex. 7 to Pl.

Mot.)  Normally, a written report would be created documenting the results (positive or negative)

of any canine test.  (See Rule 30(b)(6) Dep. of Terrence King at 74, *attached as* Ex. 12 to Def.

Opp'n and 2nd Def. Mot.)  Although Agent Pederson believes that a highway patrol report

regarding the dog alert was made, (*see* Pederson Dep. at 23), no such report exists in the record,

(*see* King Dep. at 74).  Moreover, Pederson has virtually no recollection of the test, does not

remember how Gator reacted and seems to have based his conclusion that Gator alerted to

narcotics largely on the state trooper's statement that Gator's reaction was positive.  (*See*

Pederson Dep. at 23-24, 37-38.).

---

[20]At the time the DEA forfeited the $40,000, it was standard practice to subject seized
currency to a canine alert.  (Dep. of DEA Special Agent Kevin Pederson at 10-11, *attached as*
Ex. 13 to Def. Opp'n and 2nd Def. Mot.)  The DEA has since discontinued this practice.  (*Id.*)

Based on the record evidence in this case, the positive dog alert is at best weak evidence of a connection to drug activity. *See United States v. $10,700.00 in U.S. Currency*, 258 F.3d 215, 230 (3d Cir. 2001) (finding evidence of positive dog alert "not probative" of a connection to drug activity under pre-CAFRA probable cause standard because government failed to introduce any evidence regarding "dog's past training and degree of accuracy in detecting narcotics"); *$67,220.00 in U.S. Currency*, 957 F.2d at 285-86 (recognizing general principle that positive dog alert can be "strong evidence" of connection to drugs, but finding record evidence "weak" because there was "no indication in the record as to the trustworthiness of [the] particular dog" and rejecting agents' testimony regarding dog alert because agents "testified that they did not know that the dog had alerted until the handler told them so").

3.      Lopez's alleged admission

The Government asserts that Lopez admitted that he had no other source of income other than illegal drug trafficking. This alleged admission appears in Pederson's Report of Investigation, and asserts that Lopez stated: "[I] [have] no means of income, nor any appreciable assets except those obtained as a result of [my] illegal drug trafficking activities." (Pederson Report of Investigation at 2.) However, the Government has provided absolutely no evidence to support this allegation.

According to Agent Pederson, Lopez told the undercover U.S. Marshal with whom Lopez was negotiating his escape that illegal drug trafficking was his only source of income. (Pederson Dep. at 5-6, 13, 35-36.) When asked how he learned of Lopez's alleged admission, Pederson testified that the Marshals told him, but could not remember which one. (*Id.*) U.S. Marshal Hernandez, the only U.S. Marshal who met with Lopez regarding the attempted escape, has no

memory of Lopez making any such statement.  (*Id.* at 20-22; Rashid Dep. at 81.)  U.S. Marshal

Conboy, who turned the $50,000 over to Agent Pederson, similarly has no recollection of any

such statement and has no idea how Lopez obtained the money.  (*See* Conboy Dep. at 16, 22-29.)

In fact, U.S. Marshal Conboy testified that the only reason the Marshals Service decided to

transfer the $50,000 to the DEA to pursue forfeiture proceedings was the fact that Lopez had two

prior drug trafficking convictions.  (*See* Conboy Dep. at 20; Def. Separate Stmt. of Genuine

Issues in Response to Pl.'s Stmt. of Mat. Facts Not in Dispute ¶ 13.)   After reviewing the record

evidence, it is apparent that the Government has no witness able to testify regarding this alleged

statement and has no admissible evidence that any such statement was ever made.  (*See* King

(Rule 30(b)(6)) Dep. at 20-21, 71.)

　　　　　　　　4.　　　Packaging of the currency

　　　　　The final factor alleged by the Government to connect the currency to illegal drug

activities is the packaging of the currency.  The parties agree that the currency was not new and

appeared to have been in circulation for a while.  It is also undisputed that the $40,000 seized

from Alix Coba's van was in a paper or plastic shopping bag.  The Government alleges that the

currency consisted of the following denominations: 152 $100 bills, 180 $50 bills, 922 $20 bills

and 736 $10 bills.  (*See* Def. Stmt. of Mat. Facts as to Which there is No Genuine Issue ¶ 23.)

However, the two exhibits to which Defendants refer in support of this allegation make no

reference to the denominations of the currency.  Marshal Conboy testified that it was his

recollection that the currency was bound and in a paper shopping bag, but says nothing more

regarding the denominations or packaging of the currency.  (*See* Conboy Dep. at 15.)  Defendants

also cite to Exhibit 11, which appears to be a copy of a cashier's check paid to the order of the

U.S. Marshal Service for $50,000.  However, nothing on the check makes any reference to the denominations of the currency that was presumably exchanged for the check.  (*See* Def. Opp'n & 2nd Def. Mot., Ex. 11.)

As far as the Court can tell, the Government's assertions regarding the denominations are pure speculation and unsubstantiated by any evidence whatsoever.  Moreover, even if the Court could rely on the Government's unsubstantiated assertions, delivering cash in a shopping bag (paper or plastic) does not support an inference of drug activity.  Unlike cash wrapped in plastic wrap or fabric softener, which is often used to avoid detection by trained dogs, nothing about the method of packaging in this case is "unique to the drug trade."  *See $10,700.00 in U.S. Currency*, 258 F.3d at 232-33 (rejecting government's argument that currency rubber-banded in large bundles and concealed in baggage supported an inference of drug trafficking under pre-CAFRA probable cause standard); *United States v. $84,615 in U.S. Currency*, 379 F.3d 496, 502 (8th Cir. 2004) (noting that vacuum-sealing is a "common ploy to mask odors such as might be detected by dog searches"); *United States v. $129,727.00 U.S. Currency*, 129 F.3d 486, 491 (9th Cir. 1997) (discussing nexus between use of plastic wrap and fabric softener in packaging and drug activity).  As a final observation, the Court notes that Lopez had been in jail for some time by the time Alix Coba attempted to deliver the remaining $40,000.  There is no evidence to suggest that the $40,000 was received as part of the drug exchanges for which Lopez was convicted in 1990 and 1991.

### 5.     Totality of the Evidence

The Court is thus left with the Plaintiff's convictions for drug trafficking and the positive dog alert, which, given the lack of evidence regarding its circumstances, is of limited probative

value.  Even under the pre-CAFRA probable cause standard, this case would have been a close

call.  *See $67,220.00 in U.S. Currency*, 957 F.2d at 286 (finding probable cause, but noting that

"the issue is close").  The Court does not see how the Government can  meet CAFRA's

heightened burden on the record evidence in this case.  *See $84,615 in U.S. Currency*, 379 F.3d

at 501 (finding substantial connection between currency seized from claimant's vehicle and drug

trafficking when claimant possessed marijuana at the time cash was seized, claimant possessed

unusually large amount of cash "carefully concealed in seven vacuum-sealed bags, and drug dog

alerted to seized currency"); *United States v. $174,206.00 in U.S. Currency*, 320 F.3d 658, 660,

662 (6th Cir. 2003) (finding funds seized from safe deposit boxes were traceable to drug activity

when contemporaneous search of claimants' home revealed 32 rocks of crack cocaine and a

digital scale and tax returns showed claimants' legitimate income over the previous five years

was approximately $31,000).

     As loath as the Court is to return money to a convicted felon, it is also unwilling to stretch

the law beyond the limits of reason simply to avoid a distasteful result.   On the record evidence

presented in this case, no reasonable jury could find by a preponderance of the evidence that the

$40,000 seized in connection with Plaintiff's attempt to escape from prison was traceable to a

drug exchange.  Plaintiff is therefore entitled to the return of this portion of his money.  Having

determined that the Government's claim is time barred, and further, that the Government could

not, in any event, meet the heightened burden of proof imposed by CAFRA or a Rule 41(g)

proceeding, the Court need not reach Plaintiff's argument that he is entitled to the return of his

money on due process grounds.

## **Conclusion**

Accordingly, and for the reasons described herein, the Government may retain the

$10,000 voluntarily surrendered by Alix Coba, but must return the $40,000 seized and declared

forfeited by the DEA.  Plaintiff is not entitled to pre-judgment interest.  *See United States v.*

*$30,006.25 in U.S. Currency*, 236 F.3d 610, 613-15 (10th Cir. 2000), *cert. denied, Rogers v.*

*United States,* 534 U.S. 856 (2001).  An Order consistent with this Memorandum Opinion will

issue separately.


Dated: Sept. _26th_, 2006                    _____/s/_____
                                        ALAN KAY
                                        UNITED STATES MAGISTRATE JUDGE